No. 97-229

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 172

STATE OF MONTANA,

Plaintiff and Respondent,

v.

JERRY LANTIS,

Defendant and Appellant.

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Marge Johnson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Marvin Anderson, Nathan Hoines, Great Falls, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, Jennifer Anders, Assistant Attorney General, Helena, Montana; Brant Light, Cascade County Attorney, Julie Macek, Deputy Cascade County Attorney, Great Falls, Montana

Submitted on Briefs: February 18, 1998

Decided: July 15, 1998

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

**¶1 Jerry Lantis (Appellant) appeals from a jury verdict, judgment, and sentence of the Eighth Judicial District Court, Cascade County, convicting him of deliberate homicide by accountability. We affirm.**

**¶2 We address the following issues:**

**¶3 1. Was the evidence sufficient to support Appellant's conviction for deliberate homicide by accountability?**

**¶4 2. Did the District Court abuse its discretion when it refused Defense Proposed Instruction No. 8?**

**¶5 3. Did the District Court abuse its discretion when it admitted the kitchen knife into evidence?**

# BACKGROUND

¶6 Appellant came to Great Falls in late January, 1996, to visit his mother. Appellant arranged to stay with Albert Gonzales (Gonzales), a friend of Appellant's mother's boyfriend. Also staying with Gonzales was Michael Barnaby (Barnaby) and his wife Susan Gladue. Appellant and Barnaby did not know each other prior to meeting at the Gonzales residence. At about noon on January 25, 1996, Appellant and Barnaby left the Gonzales residence with two quarts of beer. The two played basketball for awhile and ended up driving around the city drinking more beer.

¶7 Later that evening, at about midnight, Appellant and Barnaby decided to visit Garry Bailey (Bailey). Barnaby and Bailey knew each other from serving time together at the Swan River Boot Camp, being involved in the Great Falls Transition Center, and working at a local motel. Bailey was working two jobs and trying to stay sober in order to make a positive change in his life. A co-worker of Bailey's and Barnaby's, Delisa Protsman, testified that Bailey did not like Barnaby's drinking habits and that Bailey and Barnaby had occasional "run-ins" over Barnaby's alcohol consumption.

¶8 Bailey let Appellant and Barnaby into his apartment and the three sat in the living room and discussed basketball. Bailey had just finished his night shift at the motel and was getting ready for bed. At about 1:30 a.m., Bailey called two friends, Vicki Martinez and Delisa Protsman, and asked them each to give him a wake-up call because his alarm was broken and he had to work the next morning. Neither Vicki nor Delisa heard anything unusual during Bailey's call.

¶9 At 3:30 a.m., the police officers arrived at Bailey's apartment in response to a 9-1-1 call made by Donald Fann (Fann) who reported a disturbance there. Fann lived in the apartment directly behind Bailey and was the manager of the apartment building. Fann testified he was awakened by a lot of noise and what he described as the sound of "furniture flying" in Bailey's apartment. Fann testified that he heard Bailey say, "What are you guys doing this to me for?" In a prior statement made to the police, Fann reported that he heard Bailey say, "What are you doing this for?" The 9-1-1 tape was played for the jury at trial. On the tape, Fann stated, "They're fighting to beat hell. There's two guys, I think."

¶10 When Officers Grubb, Stinar, and Moccasin arrived, they heard voices coming

from a corner apartment. Fann met the officers outside and confirmed that the corner apartment was Bailey's. Fann told Officer Grubb, "It sounds like they're choking him or something." The officers knocked on the door and advised the people within to open the door. Barnaby opened the door approximately two inches. Officer Grubb shined his flashlight through the opening and saw fresh blood on Barnaby's face. Barnaby mentioned an argument between him and his wife, then attempted to shut the door. Officer Grubb placed his foot across the threshold, instructed Barnaby to back away, opened the door, and entered the apartment. Officer Grubb saw that Barnaby's hands and clothing were bloody. Officer Grubb then saw Appellant sitting in a chair and noticed that Appellant's face and jacket were also bloody. Officer Grubb asked if there were others in the apartment. Officer Grubb noticed feet in the bedroom and saw Bailey lying unconscious on the bedroom floor.

¶11 Officer Grubb instructed Officer Moccasin to call an ambulance and felt Bailey for a pulse. Officer Grubb heard Bailey gurgling but could detect no pulse. As Officer Grubb examined Bailey, Officer Stinar tried to handcuff Barnaby, but Barnaby turned and ran out the door. Appellant followed Barnaby. Officers Grubb, Stinar, and Moccasin left the apartment in pursuit of Appellant and Barnaby. The officers caught and handcuffed the men, whereupon Officer Moccasin discovered a kitchen knife tucked in Appellant's pants. Upon his arrest, Appellant told Officer Moccasin, "I'm innocent." Appellant and Barnaby were transported to the police station and Officer Grubb went back to the crime scene. Emergency paramedics arrived but were unsuccessful in reviving Bailey.

¶12 Detectives Steven Lohse, William Bellusci, and Officer David Bissonnette investigated the crime scene. The officers retrieved from Bailey's apartment the following items which were taken into evidence: a bloody pen cartridge which was found on the living room floor next to the chair where Appellant had been sitting; a broken pen tip found on the bedroom floor near Bailey's body; hairs found on and near Bailey's body; the mattress cover, sheets, pillow, quilt, and dust ruffle from the bed; a pair of gloves; Bailey's wallet; pen fragments; a baseball cap belonging to Appellant which was found lying next to Bailey's ankle; a pen spring found in the bedroom closet; keys; pieces of the bedroom closet door; and a butcher block knife holder from Bailey's kitchen.

¶13 Detective Lohse videotaped and photographed the crime scene. The videotape and photographs showed a closet door ripped off its hinges, a lamp and other items

knocked to the floor, a poster torn off the wall, clothing strewn about, blood smears on the carpet, dresser, walls, and kitchen counter, and blood stains on the bedding. At the time of death, Bailey was wearing only pants. The photographs of Bailey's body showed blood on Bailey's head, face, neck, chest, back, arms, and hands; wounds on the inside of Bailey's arm, and a large blue ink smear on the side of Bailey's torso. The photographs also showed a hat, later identified as belonging to Appellant, lying next to Bailey's left ankle.

¶14 Detective Lohse photographed the butcher block knife holder in Bailey's kitchen which had two empty slots. At trial, the butcher block and knives were admitted into evidence. Lohse testified that the brand imprinted on the knives in the butcher block, "Regent Sheffield Stainless, England," exactly matched the brand imprinted on the knife found tucked in Appellant's pants upon his arrest.

¶15 At the police station, Officer Bissonnette took photographs of Appellant and Barnaby. These photographs showed a large amount of blood on Barnaby's pants, especially in the crotch area; cuts and scratches on Barnaby's cheek; blood on Barnaby's face and hands; blood on Appellant's face and right hand, and blue ink stains on Appellant's right hand. Officer Bissonnette also took swabs of blood from Barnaby's hands and Appellant's face. Bissonnette then went to the crime scene and took swabs of blood from the bedroom carpet, the dresser, and the kitchen counter. Bissonnette sent all the swabs to the state crime lab for further processing.

¶16 Detective Bellusci assisted in transporting Appellant and Barnaby to the hospital to execute body search warrants. Detective Bellusci testified that Barnaby had a small cut on the inside of his right knee; cuts on his lower right cheek; cuts and scratches on his upper left arm and left knee; and abrasions on his back. Bellusci testified that Appellant had abrasions on his right arm. Photographs of these cuts and abrasions were admitted into evidence. Appellant's and Barnaby's clothes were removed and sent to the state crime lab for further processing.

¶17 Appellant was placed in a room at the police station and interviewed by Detective Ronald Steffens. Detective Steffens testified that Appellant had blood on his face and hands. Steffens also noticed a few cuts and ink stains on Appellant's hands. Appellant waived his *Miranda* rights and gave a taped statement. Appellant told Steffens that when Barnaby and Bailey were discussing basketball, he fell asleep in a chair and awoke to the sound of the police pounding on the door. Appellant stated

that he did not witness any fighting between Barnaby and Bailey, and that if there was a fight, he must have slept through it. Appellant told Steffens that he fled the apartment because Barnaby fled the apartment. Appellant denied being in any fight, and denied having a knife on him when he was arrested. Appellant did not know where the knife found in his pants came from, and he did not know how blood got on his face and hands. Appellant claimed that the small injury on his right hand occurred when he was rebuilding an engine and that the small injury on his back probably occurred when he was playing basketball.

¶18 At trial, Appellant testified on his own behalf and recounted new facts not previously mentioned in his taped statement to Detective Steffens. Appellant testified that he fell asleep in a chair and awoke when Barnaby grabbed him and told him they had to go. Appellant testified that he asked Barnaby why they had to go, to which Barnaby replied, "I think he's dead. I think I killed him." Appellant testified that he went to the bedroom, discovered Bailey's body lying on the floor, and began administering CPR. Appellant stated that Barnaby kicked him and that he rolled partly on top of Bailey. Appellant testified that he and Barnaby then heard knocking on the door and that Barnaby stuck something down his pants. Appellant did not know what was in his pants. Appellant stated that Barnaby then sat him in the chair and told him to be quiet. Appellant testified that he thought the blood on his face came from a nosebleed that occurred when he jumped the apartment railing and hit the ground. Appellant testified that he lied to Detective Steffens because he was scared and because he thought Detective Steffens would let him go home.

¶19 Later in the trial, the State recalled Detective Lohse as a rebuttal witness. Detective Lohse testified that he questioned Appellant's brother, Glen Lantis (Glen), two days after Bailey's death. Glen told Detective Lohse that Appellant contacted him and related the following events: that Appellant fell asleep in the chair; that he got blood on himself when Barnaby tripped over him on Barnaby's way to answer the door; that Barnaby planted the knife on him; and that blood got on his hands when a police officer wiped them with the knife. Glen also told Detective Lohse that Appellant specifically denied ever going into the bedroom.

¶20 The State presented several forensic scientists of the Montana State Crime Lab to comment on the physical evidence in this case. Deborah Hewitt (Hewitt) specializes in print and impression analysis and examined the knife which was found on Appellant. Hewitt testified that the knife had no fingerprints on it suitable for

identification. Hewitt also examined the blood stains on Barnaby's jeans and a photograph taken after the attack of Bailey's face covered with dried blood. Hewitt testified that the pattern of dried blood imprinted on Bailey's forehead was consistent in element size and fabric weave with Barnaby's denim jeans.

¶21 Julie Long (Long) specializes in the typing and identification of body fluids. Long analyzed blood samples from Appellant, Barnaby, and Bailey. She testified that the blood type of each individual was distinct. Long identified blood stains on Appellant's pants, sweatshirt, and coat as consistent with Bailey's blood type. The blood on Appellant's hands was consistent with Bailey's blood type, and the blood on Appellant's face was a mixture of both Appellant's blood and Bailey's blood. Long testified that the blood stain in the crotch area of Barnaby's pants was consistent with Bailey's blood type. Long testified that the blood inside the pen cartridge found on the floor of Bailey's apartment was also consistent with Bailey's blood. Long also testified that the blood stains found on the dust ruffle, the blanket, the quilt, the sheets, the pillow, the wall, the dresser, the carpet, the door, and the kitchen counter were all consistent with Bailey's blood type.

¶22 Alice Ammen (Ammen) specializes in the analysis of certain "trace" evidence such as hairs. Ammen examined hair samples from Appellant and Barnaby and testified that some of the hairs found on Bailey were consistent with both Appellant's and Barnaby's hair. She testified that hairs from Bailey's head were found in the carpet and the sheets and appeared to have been forcibly removed. Ammen testified that the hair combings taken from Appellant and Barnaby contained what appeared to be blood.

¶23 Dr. Jack Henneford (Dr. Henneford), a pathologist, performed the autopsy of Bailey. Dr. Henneford testified that Bailey suffered multiple injuries which he described in detail using autopsy photographs. Dr. Henneford found a large smear of blue ink located on the side of Bailey's torso, and numerous gouges and scratch marks on Bailey's face, neck, and chest that he presumed were made with the tip of a ball-point pen. Dr. Henneford identified both single and double track scratch marks, and stated that these marks suggest Bailey was scratched with a pen before and after the tip was broken. Dr. Henneford also testified that the single track scratches could have been caused by the tip of a knife. Dr. Henneford examined the pen cartridge which was found in Bailey's apartment near the chair where Appellant sat and found a small piece of human tissue inside.

¶24 Dr. Henneford found stretch marks on Bailey's face, neck, and chest and testified that these stretch marks indicated Bailey's neck had been hyper extended back or held in a choke hold. Additionally, Dr. Henneford testified that the bruises found on Bailey's lips, the cuts found on the inside of Bailey's lips, and Bailey's black eye, indicated that Bailey suffered blunt-force trauma to the mouth and eye. Dr. Henneford found bruises on the back of Bailey's head caused by blunt-force trauma, most likely by Bailey's head hitting the floor. Dr. Henneford testified that the scrape found on Bailey's knuckle was consistent with a defense-type wound.

¶25 In examining Bailey's arms, Dr. Henneford identified two wounds on Bailey's right forearm and lower wrist. Dr. Henneford described the wounds as circular, made up of a series of abrasions, and resulting in the skin being completely raked away. After seeing the other injuries and the broken pen, he testified that it was logical that these wounds were caused by the pen being ground into the skin in a repeated circular motion. On the same arm, he also found a puncture-type wound that he stated was consistent with either the pen or the tip of the knife. Dr. Henneford testified that for these wounds to be inflicted, someone would have had to hold Bailey's arm out to the side, without allowing the arm to thrash around.

¶26 Dr. Henneford found hemorrhaging around Bailey's eye, indicating a lack of oxygen. He also found bleeding points on Bailey's forehead and a bruised larynx, also indicating a lack of oxygen. Dr. Henneford testified that the cause of Bailey's death was asphyxia, which could have been caused by smothering, compression of the neck, or immobilization of the chest. Dr. Henneford described the process of asphyxia as losing consciousness within the first two to three minutes, brain damage within four minutes, and then death.

¶27 The State called Agent Ward McKay (McKay) of the Montana Department of Justice Criminal Investigation Bureau to offer his interpretation of the crime scene at trial. McKay examined the photographs, the videotape, the physical evidence, and lab reports. McKay also interviewed the investigating officers and Dr. Henneford. Based on his review of the evidence, McKay testified that the struggle occurred only in the bedroom of Bailey's apartment. He opined that the struggle began near the front of the closet, where Bailey received some type of blows that made him bleed. He opined that the struggle must have proceeded to the bed, because the blue lines on the sheets indicated that the pen was still intact. McKay testified that the pen broke sometime after the struggle left the bed, but before Bailey hit the dresser, where an

ink stain was found which was a mirror image of an ink stain found on the side of Bailey's torso. McKay testified that the struggle ended near where it began with Bailey lying on the floor on top of the closet door. McKay testified that the liquid ink found on the door indicated that the pen broke in front of the dresser and was still being used as a weapon while Bailey was lying on the floor.

¶28 McKay testified that the presence of Appellant's hat in the room, the significant amount of ink on the fingers of Appellant's right hand, and Appellant being right-handed, indicated that Appellant was in the bedroom and was involved in the struggle. McKay also observed that Bailey was found with his pants bunched up at the knees indicating that either Bailey raised his legs or someone was trying to pin Bailey down on the floor by holding his legs.

¶29 Appellant presented Robert Kopec (Kopec), a consultant forensic scientist, to testify as an expert in the areas of crime scene reconstruction and blood spatter interpretation. Kopec reviewed the photographs, physical evidence, police reports, lab reports, and McKay's report. He also interviewed Appellant the night before he testified at trial.

¶30 Kopec agreed with McKay concerning the procession of the struggle from the closet area, to the bed, to the dresser area, and back to the closet area. However, Kopec disagreed with McKay's opinion that Appellant was involved in the struggle. Kopec defined blood spatter as blood that is moving and hits an object. Kopec testified that there was blood spatter on Barnaby, but none on Appellant. He opined that Appellant would have had blood spatter all over his clothes if he was involved in the crime. Kopec testified that Appellant must have gotten blood on his face when he attempted to resuscitate Bailey, and that the blood and ink on Appellant's hands were contact transfers from the closet door. Kopec testified that there existed no scientific evidence that Appellant held Bailey down while Barnaby inflicted wounds or tried to suffocate him. He testified that he thought items of evidence had been moved around by emergency personnel or police officers while they were attending to Bailey. Additional facts will be provided as necessary to dispose of the issues raised.

DISCUSSION

*Issue 1*

¶31 Was the evidence sufficient to support Appellant's conviction for deliberate homicide by accountability?

¶32 This Court reviews the sufficiency of the evidence to determine whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Bower (1992), 254 Mont. 1, 6, 833 P.2d 1106, 1110.

¶33 Appellant was charged and convicted of deliberate homicide by accountability pursuant to §§ 45-2-301, 45-2-302, and 45-5-102, MCA, which provide in relevant part:

> **45-2-301. Accountability for conduct of another.** A person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself or that of another and he is legally accountable for such conduct as provided in 45-2-302, or both.
>
> **45-2-302. When accountability exists.** A person is legally accountable for conduct of another when: . . . (3) either before or during the commission of an offense with the purpose to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense.
>
> **45-5-102. Deliberate homicide.** (1) A person commits the offense of deliberate homicide if: (a) the person purposely or knowingly causes the death of another human being.

Taking these statutes in combination, the State, in order to convict Appellant of deliberate homicide by accountability, was required to prove beyond a reasonable doubt that Appellant: (1) had the purpose to promote or facilitate commission of deliberate homicide, and (2) aided or abetted Barnaby in the planning or commission of deliberate homicide.

¶34 Appellant disputes the sufficiency of the evidence relating to mental state for deliberate homicide by accountability. Appellant's argument is two-fold. First, Appellant argues that the State was required to prove that he engaged in conduct with the conscious object of assisting Barnaby in causing Bailey's death by

asphyxiation. Appellant argues that no rational jury could have found him accountable for Bailey's death because there is not sufficient evidence that he had the purpose to engage in, or acted in furtherance of, Bailey's asphyxiation. Second, Appellant argues that even if the State was not required to prove that he had the purpose to engage in Bailey's asphyxiation, there was still insufficient evidence from which a rational jury could find him accountable for Bailey's death. We address each argument in turn.

¶35 Appellant's first argument challenges the requirements for proof of mental state for deliberate homicide by accountability. Appellant points to Dr. Henneford's testimony that the cause of Bailey's death was asphyxiation. He then points to the photographs, physical evidence, and witness testimony tending to establish that Barnaby suffocated Bailey either by sitting on his face or choking him, or both. Appellant asserts that he cannot be held accountable for causing Bailey's death because there is not sufficient evidence that he assisted Barnaby in asphyxiation. Appellant cites State v. Rothacher (1995), 272 Mont. 303, 901 P.2d 82, for his proposition that in order to convict him of deliberate homicide by accountability, the State was required to prove that he had the conscious object to engage in Bailey's asphyxiation or a similar type of lethal harm. In Rothacher, we held that the mental state for deliberate homicide can be established if the result involves the same or similar kind of harm or injury as contemplated by the defendant, although the actual degree of injury is greater than intended. Rothacher, 272 Mont. at 307, 901 P.2d at 85. In reaching our holding, we relied on § 45-2-201(2)(b), MCA, which provides:

> **Causal relationship between conduct and result.** If purposely or knowingly causing a result is an element of an offense and the result is not within the contemplation or purpose of the offender, either element can nevertheless be established if: . . . the result involves the same kind of harm or injury as contemplated but the precise harm or injury was different or occurred in a different way, unless the actual result is too remote or accidental to have a bearing on the offender's liability or on the gravity of the offense.

Rothacher, 272 Mont. at 307, 901 P.2d at 84-85. We reject Appellant's argument concerning the mental state necessary to prove deliberate homicide by accountability for two reasons.

¶36 First, Rothacher is inapposite for the position advanced by Appellant. In arguing

that <u>Rothacher</u> applies to deliberate homicide by accountability, Appellant ignores the distinction between deliberate homicide and deliberate homicide by accountability, and how § 45-2-201(2)(b), MCA, applies differently to each offense. For deliberate homicide, the "result" referenced in § 45-2-201(2)(b), MCA, is the death of another human being. However, for deliberate homicide by accountability, the "result" referenced in § 45-2-201(2)(b), MCA, is not the death of another human being, but rather some act designed to promote or facilitate causing the death of another human being. Because the application of § 45-2-201(2)(b), MCA, to each offense is distinguishable, <u>Rothacher</u> is distinguishable from the instant case.

¶37 Second, Appellant's position flows from a narrow interpretation of causation and runs contrary to the theory and settled law of accountability. Regarding accountability in general, we have held:

> A true accomplice is one who knowingly, voluntarily and with common intent with the principal offender unites in the commission of a crime . . . . One may be an accomplice by being present and joining in the criminal act, by aiding and abetting another in its commission, or not being present, by advising and encouraging its commission; but knowledge and voluntary actions are essential in order to impute guilt.

State v. Nordahl (1984), 208 Mont. 513, 517, 679 P.2d 241, 243 (citations omitted). The key words in the above quotation are *impute guilt*. "Impute" means "to attribute vicariously, " Black's Law Dictionary 682 (5th ed. 1979), or "to credit by transferal to the account of someone other than the initiating agent." Webster's Third New International Dictionary 1139 (1971). Accountability is "merely a conduit by which one is held criminally responsible for the acts of another." Matter of B.D.C. (1984), 211 Mont. 216, 220-21, 687 P.2d 655, 657. We further commented upon the theory of accountability in State v. Gollehon (1993), 262 Mont. 1, 25-26, 864 P.2d 249, 265:

> Accountability . . . is a connection provided by our legislature that gives courts and juries a way to make people "accountable" or responsible for a crime that has definitely been committed. The responsibility for the crime attaches by way of acts committed by the accused. The accused either participated in a communal crime or aided, abetted another, or planned the crime.

¶38 Appellant seeks to change the theory of accountability by introducing varying degrees of causation or culpability into the accountability statute. Appellant argues that he is less culpable because he did not engage in suffocating Bailey, and that because of this lesser degree of culpability, he cannot be held accountable for Bailey's death. We specifically rejected such an argument in Gollehon. We stated:

> [O]ur legislature never meant to dilute responsibility for a criminal act when that act was committed by more than one person, but instead meant that all those participating in a crime be "accountable" for *the whole* of the responsibility of that act.

. . .

> If a person has conspired to commit and facilitated the commission by another of a criminal act, he is no less guilty because he did not "pull the trigger."

Gollehon, 262 Mont. at 26, 27, 864 P.2d at 265, 266 (citations omitted)(emphasis in original).

¶39 In determining the level of involvement an accused must have to be found guilty of a crime by accountability, we have held that although mere presence at the scene of a crime is insufficient to prove accountability, "the accused need not take an active part in any overt criminal acts to be adjudged criminally liable for the acts." State v. Miller (1988), 231 Mont. 497, 511, 757 P.2d 1275, 1284 (citations omitted). In other words, an accused's act of aiding or abetting under the accountability statute need not be criminal in nature; it need only promote or facilitate commission of the crime. *Compare* Miller, 231 Mont. at 509-12, 757 P.2d at 1283-84 (defendant's convictions of deliberate homicide under the felony murder rule and felony assault by accountability were upheld where, even though the evidence did not create a prima facie case against the defendant, it tended to connect him to the charged crimes); *and* State v. Dess (1984), 207 Mont. 468, 473, 674 P.2d 502, 505 (defendant's conviction for theft by accountability was upheld where although he did not physically steal the bicycles, he was seen in a car following the perpetrators who were riding the stolen bicycles, and was later stopped with one of the bicycles in the back of his car); *with* State v. Fish (1980), 190 Mont. 461, 469-71, 621 P.2d 1072, 1077-78 (defendant's

conviction for attempted burglary by accountability was overturned where the only evidence against defendant was testimony that he had been seen with the perpetrators earlier in the evening, and that he knocked on the victim's door but then got off the porch and watched the perpetrators kick down the door).

¶40 Upon the above statutory and case law, we conclude that Appellant's argument that the State was required to prove that he acted with the conscious object to engage in Bailey's asphyxiation is groundless. We turn then to Appellant's second argument.

¶41 Appellant argues that even if we reject his argument concerning <u>Rothacher</u> and the mental state for deliberate homicide by accountability, there was still insufficient evidence from which a rational jury could find that Appellant had the purpose to promote or facilitate commission of deliberate homicide, or that he aided and abetted Barnaby in the planning or commission of deliberate homicide. Appellant argues that at best the evidence shows he was present in the bedroom, he got blood on his face and ink transfers on his hand from attempting to resuscitate Bailey, and he fled the scene because he was scared. The State counters that Appellant's challenge to the sufficiency of the evidence must fail as it is wholly dependent on his version of the facts, which the jury was entitled to reject. We agree with the State.

¶42 In State v. Bower (1992), 254 Mont. 1, 8, 833 P.2d 1106, 1111, we stated:

> The fact that the defendant's testimony conflicted with that of the State's witnesses does not, by itself, render the evidence insufficient to support his conviction. The weight of the evidence and the credibility of the witnesses are exclusively within the province of the trier of fact; when the evidence conflicts, the trier of fact determines which shall prevail.

As in <u>Bower</u>, the jury in the instant case weighed the evidence, assessed the credibility of witnesses, and found that the State's version of the incident was more credible than Appellant's. Such a finding is supported by the evidence.

¶43 The State produced sufficient evidence from which a jury could find that Appellant had the purpose to promote or facilitate commission of deliberate homicide, and aided and abetted Barnaby in the commission of deliberate homicide. The blood on Appellant's face was consistent with Bailey's blood and also Appellant's own blood, suggesting that Appellant received some injury during the

incident. Appellant also had blood in his hair, which was consistent with the State's theory that Appellant was an active participant in the crime and did not merely attempt to resuscitate Bailey. Some of the hairs found on Bailey were consistent with Appellant's, Appellant's hat was found near Bailey's feet, and a bloody kitchen knife was found tucked into Appellant's pants upon arrest.

¶44 The broken ink pen which was used to injure Bailey was found next to the chair where Appellant had been sitting when police officers arrived. Photographs of Appellant taken after the incident showed ink stains primarily on Appellant's right hand. Appellant was right-handed. Pen fragments and a broken pen tip were found near Bailey's body. Dr. Henneford found both single and double track scratch marks on Bailey suggesting that the marks were made before and after the pen tip broke. Dr. Henneford described circular wounds on Bailey's arms which were likely inflicted with the ink pen while Bailey was immobilized on the floor with his arm out to the side, suggesting that one person probably held Bailey down while the other gouged marks in Bailey's skin. Bailey was found with his pant legs bunched up to his knees, indicating that one person might have tried to pin Bailey down for the other person.

¶45 It is also significant that Appellant's version of events at trial was not consistent with previous statements he made to Detective Steffens and his brother, Glen. Appellant initially told Detective Steffens that he slept through the whole incident, and was unaware of what happened until shortly before the police arrived. Appellant told Detective Steffens that he did not know where the knife found in his pants came from, and did not know how blood got on his face. Two days later, Appellant told his brother that he got blood on himself when Barnaby tripped over him on his way to answer the door; that Barnaby planted the knife on him; and that he got blood on his hands when a police officer wiped them with the knife. It was not until trial that Appellant claimed that he tried to resuscitate Bailey, causing the transfer of blood to his face and ink to his hands. In light of these conflicting statements, the jury was entitled to question Appellant's credibility and reject his version of events at trial.

¶46 Appellant argues that it was improper for the jury to infer from circumstantial evidence alone that he had the common purpose with Barnaby to promote or facilitate commission of deliberate homicide. "[W]e have held numerous times that circumstantial evidence is sufficient to support a conviction." Miller, 231 Mont. at 511-12, 757 P.2d at 1284. In State v. Bradford (1984), 210 Mont. 130, 142, 683 P.2d

**924, 930, we upheld a jury's finding of common purpose based on circumstantial evidence. The State also notes that Montana's accountability statutes, §§ 45-2-301 through 303, MCA, were taken from the Illinois Criminal Code sections 5-1 through 5-3 (1961), and that Illinois has held that proof of common purpose need not be supported by words of agreement or direct evidence, but can be inferred from circumstantial evidence.** *See* **People v. Hubbard (Ill. 1972), 281 N.E.2d 767, 770. This Court has already determined that when Montana adopts statutes from other states, we will also adopt the case law from that state which interprets the statute. State v. Tower (1994), 267 Mont. 63, 67, 881 P.2d 1317, 1319; State v. Murphy (1977), 174 Mont. 307, 311, 570 P.2d 1103, 1105. We hold that it was proper for the jury to infer from circumstantial evidence that Appellant had the common purpose with Barnaby to promote or facilitate commission of deliberate homicide.**

*Issue 2*

¶47 Did the District Court abuse its discretion when it refused Defense Proposed Jury Instruction No. 8?

**¶48 We review jury instructions in a criminal case to determine whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case. State v. Goulet (1997), 283 Mont. 38, 41, 938 P.2d 1330, 1332. The district court has broad discretion in instructing the jury, and, while the defendant is entitled to have instructions on his theory of the case, he is not entitled to an instruction concerning every nuance of his argument. <u>Goulet</u>, 283 Mont. at 41, 938 P.2d at 1332.**

**¶49 Appellant offered the following proposed instruction No. 8 which provides:**

> To convict Jerry Lantis of Accountability (Deliberate Homicide) by being legally accountable for the conduct of Michael Barnaby, the State must prove the following elements:
>
> 1. That the crime of Deliberate Homicide as defined in Instruction No. has been committed by Michael Barnaby;
>
> 2. That Jerry Lantis solicited, aided, abetted, agreed or attempted to aid Michael Barnaby in the planning or commission of Deliberate Homicide;

3. That Jerry Lantis participated either before or during commission of Deliberate Homicide; and

4. That Jerry Lantis had the concurrent specific purpose to promote or facilitate the commission of Deliberate Homicide.

**The District Court refused this jury instruction on the grounds that it was cumulative, and that the State's Proposed Jury Instruction Nos. 14 and 22, as modified by the court, adequately instructed the jury on deliberate homicide by accountability. State Proposed Instruction No. 14 (given as Court's Instruction No. 23) provides in relevant part:**

To convict the defendant of ACCOUNTABILITY FOR DELIBERATE HOMICIDE by being legally accountable for the conduct of another, the State must prove the following elements:

1. That the crime of DELIBERATE HOMICIDE as defined in Instruction No. 18 has been committed; and

2. that the defendant, with common purpose with the principal offender, either before or during the commission of an offense, and with the purpose to promote or facilitate such commission solicits, aids, abets, agrees, or attempts to aid, such other person in the planning or commission of the offense.

State Proposed Instruction No. 22 (given as Court's Instruction No. 22) set out verbatim the language of § 45-2-201(2)(b), MCA, and added the following caveat: "You may not infer purpose or knowledge on the part of Mr. Lantis solely from actions of Mr. Barnaby."

**¶50 Appellant claims that the given instructions misstated the law on mental state for deliberate homicide by accountability. Citing <u>Rothacher</u>, Appellant argues that the jury should have been instructed that in order to convict him of deliberate homicide by accountability, the State was required to prove that he had the specific intent to promote or facilitate commission of deliberate homicide. We reject Appellant's argument for the reasons already discussed in *Issue 1* of this Opinion. Having reviewed the given instructions, we conclude that they correctly and adequately instructed the jury on the mental state for deliberate homicide by accountability.**

*Issue 3*

¶51 Did the District Court abuse its discretion when it admitted the kitchen knife into evidence?

¶52 **The standard of review for evidentiary rulings is whether the district court abused its discretion. Gollehon, 262 Mont. at 301, 864 P.2d at 1263. The determination of whether evidence is relevant and admissible is left to the sound discretion of the trial judge and will not be overturned absent a showing of abuse of discretion. Gollehon, 262 Mont. at 301, 864 P.2d at 1263.**

¶53 **During its case in chief, the State admitted into evidence the knife found on Appellant at the time he was arrested. Appellant objected to this evidence on grounds of relevancy, but the court overruled his objection. On appeal, without citation to authority, Appellant argues that the knife was not relevant to the issues in this case because Bailey died of asphyxiation, and because there was no evidence that the knife was used to attack Bailey. Appellant's argument is without merit.**

¶54 **"Relevant evidence" is defined as:**

> evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Relevant evidence may include evidence bearing upon the credibility of a witness . . . .

Rule 401, M.R.Evid. **The knife found on Appellant matched the set of knives found in Bailey's kitchen. The knife had Bailey's blood on it. Dr. Henneford testified that the single track scratch marks found on Bailey's body could have been made with the tip of a knife. These facts tend to connect Appellant to the crime scene and suggest his involvement in the crime. We conclude that the presence of the bloody knife on Appellant after he fled Bailey's apartment is relevant to the issue of whether Appellant aided and abetted Barnaby in the commission of deliberate homicide.**

¶55 **Appellant argues that even if relevant, the prejudicial effect of the knife outweighed any probative value. Rule 403, M.R.Evid. provides:**

> Although relevant, evidence may be excluded if its probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . .

**Without citation to authority, Appellant contends that admission of the knife into evidence mislead the jury as it permitted the jury to "jump to the conclusion" that the knife was somehow involved in the murder when the evidence showed that Bailey died of asphyxiation. Appellant's argument is unpersuasive. In light of the evidence pertaining to the knife previously discussed, any inference by the jury that the knife was somehow involved in the murder is justified. In any violent homicide, most evidence linking the defendant to the crime is likely to be somewhat prejudicial. In the instant case, admission of the knife was not so prejudicial as to warrant exclusion under Rule 403, M.R.Evid. We conclude that the District Court did not abuse its discretion in admitting the knife into evidence.**

**¶56 Affirmed.**

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ TERRY N. TRIEWEILER