No. 00-469

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 220

STATE OF MONTANA,

Plaintiff and Respondent,

v.

DAVID G. VAINIO,

Defendant and Appellant.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

John Smith, David C. Avery, Smith & Thiel, Missoula, Montana

For Respondent:

Mike McGrath, Montana Attorney General, Barbara C. Harris, Kathy Seeley, Assistant
Montana Attorneys General, Helena, Montana

Submitted on Briefs: May 3, 2001
Decided: November 7, 2001

Filed:

_____

Clerk


Justic James C. Nelson delivered the Opinion of the Court.

¶1 David G. Vainio (David), a licensed optometrist, was charged in the First Judicial District Court, Lewis and Clark County, with three counts of Medicaid fraud and one count of unsworn falsification to authorities. Following a jury trial, David was found guilty of two of the Medicaid fraud counts as well as the count of unsworn falsification to authorities. His sentences on the Medicaid fraud counts were deferred for five years and his six-month jail sentence on the other charge was suspended on conditions. David appeals his judgment and sentence. We reverse.

¶2 David raises several issues which we have tailored for clarity as follows:

¶3 1. Whether the District Court erred by failing to dismiss Count I on the grounds that it is based on the violation of an administrative policy which had not been adopted in compliance with the Montana Administrative Procedure Act (MAPA).

¶4 2. Whether Montana's Medicaid fraud statute violates due process on void-for-vagueness grounds because it criminalizes violations of informal administrative policies.

¶5 3. Whether David's conviction on Count II should be reversed because it was based on the violation of n administrative policy which had not been adopted in compliance with MAPA.

¶6 4. Whether David's conviction on Count II violates due process because the State was not required to prove that David knowingly submitted false claims to Medicaid.

¶7 5. Whether the State introduced sufficient evidence to convict David on Count IV, unsworn falsification to authorities.

¶8 Because we determine that Issues 1, 3 and 5 are dispositive, we do not address Issues 2

and 4.

## Factual and Procedural Background

¶9 Medicaid is a publicly funded medical insurance program established to provide health-care coverage for persons who cannot otherwise afford coverage. The federal legislation establishing the Medicaid program is known as Title XIX of the Social Security Act. In 1967, the Montana Legislature chose to participate in the Medicaid program and authorized what is now the Department of Public Health and Human Services (DPHHS) to implement a state Medicaid program that complies with Title XIX and the federal regulations interpreting Title XIX. Section 53-6-101, MCA.

¶10 In 1977, Congress enacted the Medicare-Medicaid Anti-Fraud and Abuse Amendments to Title XIX. These amendments authorized the creation of state Medicaid fraud control units and made funds available for states to prosecute Medicaid fraud. 42 U. S.C. §§ 1396b(a) and (q). Initially, the Montana Legislature chose not to create a fraud control unit. However, in 1993, Congress mandated that all states participating in Medicaid establish fraud control units by 1995. Hence, the 1995 Montana Legislature established the Medicaid Fraud Control Unit within the Department of Justice. Section 53-6-156, MCA. At the same time, the Legislature enacted a statute under which the unit could prosecute fraud. Section 45-6-313, MCA.

¶11 The rules governing Montana's Medicaid program at the time relevant to this case were set forth in Rule 46.12.101, *et seq*., ARM. (now Rule 37.82.101, *et seq.,* ARM). DPHHS contracts with Consultec, a subsidiary of General American Life Insurance Company, to act as DPHHS's fiscal agent by enrolling providers of services paid for by Medicaid and by processing claims submitted by the providers of those services. The Medicaid program is voluntary and medical providers are not automatically Medicaid providers. They must enroll with Consultec to become a Medicaid provider.

¶12 David initially enrolled with Consultec in 1979 and again in 1985. In early 1997, DPHHS mandated that all Medicaid providers re-enroll. Consequently, David re-enrolled with Consultec in April 1997.

¶13 On April 17, 1998, the State charged David with three counts of Medicaid fraud in violation of § 45-6-313(1)(a)(ii), MCA, and one count of unsworn falsification to authorities in violation of § 45-7-203, MCA. Count I of the information alleged that David

committed Medicaid fraud by authorizing the submission of Medicaid payment claims for services performed by another licensed optometrist. Count II alleged that David committed Medicaid fraud by authorizing the submission of Medicaid payment claims for examinations of new patients who were actually established patients. Count III alleged that David committed Medicaid fraud by authorizing the submission of Medicaid payment claims for comprehensive examinations when less than comprehensive examinations were performed. And, Count IV alleged that David committed unsworn falsification to authorities by omitting information on a Montana Medicaid Provider Enrollment Form.

¶14 The following is a summary of the facts and allegations pertinent to each charge.

### Count I

¶15 In 1990, Leonard Vainio, David's brother, who, at that time was also a licensed optometrist, left Montana to practice optometry in Washington.[1] In 1993, Leonard's Montana Medicaid provider numbers were terminated because they were no longer being used. In November 1996, Leonard returned to Montana. By then, David owned more than a dozen optometric stores across the State. Leonard began performing optometric services in David's two Missoula stores. David submitted claims to Medicaid under his provider number for services performed by Leonard even though other optometrists working for David used their own provider numbers. The State asserted that this billing practice is contrary to Medicaid policy.

### Count II

¶16 Montana's Medicaid program distinguishes between "new" and "established" patients. The term "new" patients refers to patients the optometrist has never seen before and to patients the optometrist has not seen in two years. Each of David's stores sent their billing information to David's main office in Deer Lodge which in turn billed Medicaid. The State alleged that between April 11, 1995, and December 31, 1997, David's office submitted 210 claims for comprehensive examinations of "new" patients who should have been billed as "established" patients. At that time, Medicaid paid $44.53 for a comprehensive examination of a "new" patient and only $29.11 for a comprehensive examination of an "established" patient.

### Count III

¶17 Because Leonard did not completely fill out the examination forms for several patients, the State alleged that David billed Medicaid for comprehensive examinations on those patients even though Leonard may have performed less than a comprehensive examination.

*Count IV*

¶18 In his 1997 Medicaid provider re-enrollment form, David answered "No" to the following question: "Are you the spouse, parent, child or sibling of other persons who have an ownership or control interest of 5% or more, OR is an agent or managing employee in this provider entity?" At one point, David's sister managed his Bozeman store and David's wife participated in the hiring of an optician. In addition, after Leonard moved to Washington, David failed to remove Leonard's name from the title of the corporation. The State maintained that these facts established that David answered the question falsely.

¶19 The Medicaid form also asked the name of the county in which David provided Medicaid services. A provider is assigned and is supposed to use a different provider number for each location of service. Although he had offices in several counties, David answered only "Powell County" to the question indicating the county in which his main office is located. Hence, the State alleged that David purposely omitted information on the re-enrollment form.

¶20 David pleaded not guilty to all of the charges and went to trial. On February 11, 2000, a jury found David guilty of Counts I, II and IV, and acquitted him of Count III. The District Court deferred imposition of David's sentence on Counts I and II for five years with the periods of deferral to run concurrently. The court also sentenced him to six months in jail on Count IV, but suspended that sentence on conditions. David appeals his judgment and sentence.

**Issue 1.**

¶21 *Whether the District Court erred by failing to dismiss Count I on the grounds that it is based on the violation of an administrative policy which had not been adopted in compliance with the Montana Administrative Procedure Act (MAPA).*

¶22 While the jury found David guilty of Medicaid fraud, it was the District Court that concluded as a matter of law that a violation of the administrative policies at issue in this case formed a criminal act. Therefore, we review the District Court's conclusions of law to

determine if they are correct. *State v. Stucker*, 1999 MT 14, ¶ 15, 293 Mont. 123, ¶ 15, 973 P.2d 835, ¶ 15 (citing *State v. Ahmed* (1996), 278 Mont. 200, 207, 924 P.2d 679, 683, *cert denied*, *Ahmed v. Montana*, 519 U.S. 1082, 117 S.Ct. 748, 136 L.Ed.2d 686).

¶23 In charging David for submitting claims under his provider number for services performed by Leonard, the State asserted that this practice was contrary to DPHHS policy and was thus a violation of § 45-6-313, MCA, the Medicaid fraud statute. This statute provides, in relevant part:

> (1) A person commits the offense of medicaid fraud when:
>
> (a) the person obtains a medicaid payment or benefit for the person or another person by purposely or knowingly:
>
> . . .
>
> (ii) making, submitting, or authorizing the making or submitting of a medicaid claim, statement, representation, application, or document under the medicaid program for a service or item when the person knows or has reason to know that the person is not entitled under applicable statutes, regulations, rules, or *policies* to medicaid payment or benefit for the service or item or for the amount of payment requested or claimed; . . .

Section 45-6-313(1)(a)(ii), MCA (emphasis added).

¶24 David argues that by criminalizing violations of administrative policies which have not been promulgated as rules, the Medicaid fraud statute "squarely contravenes" MAPA (Title 2, Chapter 4, Montana Code Annotated) and that policies which have not been promulgated according to MAPA lack the force of law. The State argues, on the other hand, that the Medicaid fraud statute specifically refers to "policies" and does not require that those policies be embodied in a rule promulgated pursuant to MAPA.

¶25 Article II, Section 8 of the Montana Constitution provides:

> **Right of participation.** The public has the right to expect governmental agencies to afford such reasonable opportunity for citizen participation in the operation of the agencies prior to the final decision as may be provided by law.

¶26 Heeding this constitutional provision, the Montana Legislature has enacted laws expressly aimed at securing the public's right to participate in the operations of Montana's administrative agencies including that agencies must develop procedures which permit public notice and comment during the administrative process, § 2-3-103, MCA, and that agencies must hold proceedings that comply with MAPA in order to promulgate rules, § 2-3-104(2), MCA.

¶27 Moreover, under MAPA, prior to adopting, amending, or repealing a rule, an administrative agency must comply with the public notice and comment procedures detailed in §§ 2-4-302 and 305, MCA. Unless a rule is adopted in substantial compliance with these procedures, the rule is not valid. Section 2-4-305(7), MCA.

¶28 David correctly notes that this Court has twice held that an agency's failure to comply with MAPA invalidates a purportedly adopted rule. In *Rosebud County v. Department of Revenue* (1993), 257 Mont. 306, 849 P.2d 177, the Department of Revenue (DOR) changed the method for assessing the market value of heavy equipment. Without any public notice, the DOR sent a letter to all county assessors directing them to use the new method. When the county assessors did as they were directed, certain counties experienced substantial tax revenue losses. After those counties objected, the DOR initiated a formal rule-making process resulting in a public hearing. There was much opposition to the new appraisal method at the hearing. Support for the change came in the form of letters from contractors and mining companies. *Rosebud County*, 257 Mont. at 308, 849 P.2d at 178.

¶29 After DOR gave notice of the adoption of the proposed rule, a district court invalidated the rule because DOR had not complied with the notice and comment requirements of MAPA, but had instead undertaken a formal rule-making process only after establishing the rule by administrative fiat. *Rosebud County*, 257 Mont. at 310, 849 P.2d at 180. We affirmed the District Court in that case noting that the rule-making process at issue was, in essence, "a sham" and that the result was that "the public, the Legislature, and certain affected agencies were denied their right to participate effectively in the governmental process." *Rosebud County*, 257 Mont. at 311, 849 P.2d at 180.

¶30 Similarly, in *Northwest Airlines v. State Tax Appeal Bd.* (1986), 221 Mont. 441, 720 P.2d 676, this Court invalidated another DOR rule which had not been adopted in compliance with MAPA. In that case, a DOR auditor decided to include an airline's non-stop, fly-over mileage in the numerator of a tax apportionment formula for computing the corporate license tax owed by an airlines. We held in that case that because the DOR

decision qualified as a rule under § 2-4-102, MCA, it, therefore, was subject to the notice and comment requirements of MAPA and, because the rule had been adopted without any such notice and comment, it was invalid. *Northwest Airlines*, 221 Mont. at 445, 720 P.2d at 678.

¶31 The State, on the other hand, relies on *Huether v. District Court*, 2000 MT 158, 300 Mont. 212, 4 P.3d 1193, for the idea that MAPA is irrelevant to the Medicaid fraud statute because that statute does not expressly incorporate MAPA's procedural requirements and that this Court would be improperly adding language to the Medicaid fraud statute if the Court were to hold that a rule or policy cannot be the basis of a conviction unless the rule or policy had been promulgated according to MAPA.

¶32 However, the State's reliance on *Huether* is misplaced. In *Huether*, the personal representative of a deceased hospital patient sought documents indicating whether the decedent's vital signs had been monitored prior to his death. The hospital resisted disclosure by pointing to §§ 50-16-201 through 205, MCA, which provide for confidentiality of information and proceedings of medical peer review committees. *Huether*, ¶¶ 4-5. In holding that the discovery request should not have been quashed, this Court explained that the medical peer review confidentiality statutes must be reconciled with another segment of Montana law, the Uniform Health Care Information Act, which establishes a patient's right to inspect information relating to the patient's health care. *Huether*, ¶¶ 12-19. Consequently, in order to give effect to all of the relevant statutes, this Court realized the need to limit the meaning of the last portion of § 50-16-203, MCA, providing for confidentiality of all proceedings, records, and reports of health care facility committees. *Huether*, ¶ 20.

¶33 Applying these principles to the present case, a charge of Medicaid fraud cannot be based on the violation of a policy which has not been adopted in compliance with MAPA. The Medicaid fraud statute's use of the term "policies" is limited to those policies which have been formally adopted as rules. There is no other way to reconcile the Medicaid fraud statute and MAPA if MAPA is to have its intended effect.

¶34 Furthermore, the fact that the Medicaid fraud statute does not expressly reference MAPA does not mean that providers can be criminally prosecuted for violating DPHHS's informal policies. Under MAPA, an administrative policy cannot have legal effect independent of a rule. MAPA defines a rule as follows:

> "Rule" means each agency regulation, standard, or statement of general applicability that implements, interprets, or prescribes law or policy or describes the organization, procedures, or practice requirements of an agency.

Section 2-4-102(11), MCA.

¶35 The State, however, claims that MAPA's definition of "rule" only applies to that term as it is used in MAPA itself. However, Montana's statutory code contains no other definition of an administrative rule because MAPA has already defined the term "rule" and established rule making procedures for the entire code. *See* § 1-2-107, MCA (whenever a word is defined in any part of the code, that definition is applicable throughout the code, except where a contrary intention plainly appears).

¶36 Moreover, under *Rosebud County* and *Northwest Airlines*, the statute granting the DOR authority to promulgate rules "to supervise the administration of all revenue laws of the state and assist in their enforcement," § 15-1-201, MCA, includes no reference to MAPA. Even so, this Court invalidated the challenged rules because the DOR failed to abide by MAPA's mandates. *Rosebud County*, 257 Mont. at 310-11, 849 P.2d at 180; *Northwest Airlines*, 241 Mont. at 445, 720 P.2d at 678. Thus it is evident from our holdings in these two cases that when the Montana Legislature authorizes an agency to adopt rules, the procedures mandated by MAPA apply regardless of whether the authorizing statute expressly refers to MAPA.

¶37 Moreover, in the general provisions section of MAPA, the Legislature included the following provision:

> **Construction and effect.** Nothing in this chapter shall be considered to limit or repeal requirements imposed by statute or otherwise recognized law. *No subsequent legislation shall be considered to supersede or modify any provision of this chapter, whether by implication or otherwise, except to the extent that such legislation shall do so expressly.*

Section 2-4-107, MCA (emphasis added). The latter sentence of this statute indicates that the Medicaid fraud statute cannot, through the mere insertion of the word "policies," implicitly override MAPA's intricate protection of the public's constitutional right to participate in administrative government. The Medicaid fraud statute does not have to expressly reference MAPA for MAPA to apply, rather, MAPA must be followed because

the Medicaid fraud statute does not expressly repudiate it.

¶38 David notes that DPHHS's policy against submitting claims under another service provider's number was not formally adopted as a rule by DPHHS until March 12, 1998, almost three months after the end of the period of alleged fraud. At that time, DPHHS adopted the following rule:

> A person enrolled as an individual provider may not submit a claim for services that the provider did not personally provide, inclusive of services provided by another person under the provider's supervision, unless authorization to bill for and receive reimbursement for services the provider did not personally provide is stated in administrative rule or a Montana medicaid program manual and is in compliance with any supervision requirements in state law or rule governing the provider's professional practice and the practice of assistants and aides.

Rule 46.12.303(16), ARM (later renumbered as Rule 37.85.406(16), ARM).

¶39 When DPHHS proposed adopting the policy at issue in Count I as a rule, after the period of alleged fraud, DPHHS explained that the proposed amendment to Rule 46.12.303, ARM,

> explicitly limits billing by and reimbursement of individual providers to those services directly provided by the provider unless otherwise authorized. *The proposed amendment eliminates textual confusion* that in the recent past has led to administrative appeals in relation to the denial of reimbursement for services provided by persons working under or with a provider and billed for through the provider.
>
> . . .
>
> . . . *Leaving the rule unchanged would also result in continuing confusion and conflict over billing practices in the circumstances addressed.* [Emphasis added.]

David maintains that DPHHS made this concession only 15 days after the end of the period of alleged fraud in Count I. As David points out, an informal policy which has been the source of confusion and administrative appeals cannot be the basis of a criminal charge if due process is to have any meaning.

¶40 The State justified Count I on the grounds that the policy at issue was explained to David in a letter addressed to him in September 1988. However, the State's reliance on the 1988 letter merely serves to underscore the insufficient notice which is afforded by the policy at issue in Count I. Had the policy been a formally promulgated rule, DPHHS would not have had to write David a letter explaining the policy, it could have just sent him a copy of the rule itself and the rule would have been included in the billing manuals sent to all providers.

¶41 In addition, this letter did not inform David that violations of the policy could have criminal repercussions. And, as Paul Miller, who wrote the 1988 letter testified at trial, he could not establish policy in a personal letter and the policy at issue in Count I was not expressed in a rule or in the provider manuals until November 1997 (after the period of alleged fraud), by which time the policy was being promulgated as a rule under MAPA.

¶42 The State, in discussing this letter in its brief on appeal, states that "[t]he basis for the notification was Mont. Admin. R. 46.12.301 (1995, 1997), which states that providers are to comply with applicable state and federal statutes and Mont. Admin. R. 46.12.302 (1995, 1997), which states that providers are to enroll with the Medicaid program . . . ." It is beyond our comprehension how a letter written in 1988 can be based on a rule that was not promulgated until 1995. Furthermore, there was no Medicaid fraud statute in 1988. The Medicaid fraud statute was not enacted until 1995, seven years after David's receipt of the letter.

¶43 David points out that while the State has sought to hold him criminally accountable for violating an informal policy, DPHHS has been excused from violating rules which it had formally adopted. Prior to March 10, 1997, Rule 46.12.303(9), ARM, required DPHHS to notify a provider of its intention to contest a particular Medicaid claim within thirty days of receiving the claim. Rule 46.12.407, ARM, required DPHHS to notify a provider of any information DPHHS had obtained that the provider "may have submitted bills . . . in a manner inconsistent with program requirements." DPHHS repealed these rules on March 10, 1997, so as to not require DPHHS to notify providers of discovered billing improprieties. Contrary to the mandates of these rules, DPHHS had information as early as December 6, 1996, that David was submitting the claims which became the bases of Counts I and II, yet DPHHS never notified David it intended to contest the claims. Thus, as David explains, while DPHHS was investigating him for violations of an informal policy which had not been adopted as a rule, DPHHS was ignoring rules which actually had the force of law.

¶44 Moreover, Rule 46.12.303(16), ARM, has arguably brought Montana's Medicaid program out of compliance with federal law. "Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of Title XIX." *Harris v. McRae* (1980), 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784; *Planned Parenthood v. Blouke* (D.Mont. 1994), 858 F. Supp. 137, 137-38. One of the federal regulations implementing Title XIX provides that Medicaid payment may be made to the employer of a practitioner, "if the practitioner is required as a condition of employment to turn over his fees to the employer." 42 C.F.R. § 447.10(g)(1). Rule 46.12.303(16), ARM, and the policy which preceded it, purport to prohibit this payment arrangement in situations in which a provider is also the employer of other practitioners. Federal law does not recognize such a prohibition.

¶45 Nothing the State or DPHHS can do will change the fact that during the period of alleged fraud, the billing practice at issue in Count I was not illegal. The existence of the 1988 letter does not change the fact that there was no formal or legally effective prohibition against the billing practice at issue in Count I until after the period of alleged fraud.

¶46 Accordingly, we hold that the District Court erred by failing to dismiss Count I on the grounds that it is based on the violation of an administrative policy which had not been adopted in compliance with MAPA.

## Issue 3.

¶47 *Whether David's conviction on Count II should be reversed because it was based on the violation of an administrative policy which had not been adopted in compliance with MAPA.*

¶48 David argues that Count II should be reversed because although the definitions of "new" and "established" patients may have been stated in the provider manual, they had never been specifically adopted as a rule pursuant to MAPA. The State argues that there is no requirement in the Medicaid fraud statute, that the policy regarding claims for new or established patients be promulgated pursuant to MAPA.

¶49 Section 53-6-113(3), MCA, provides that DPHHS "shall establish by rule" the reimbursement rates for Medicaid services. This directive was enacted in 1989.

Nevertheless, the reimbursement rates at issue in Count II were not established through notice, public comment, and official publication as expressly required by MAPA. As we noted in our discussion in Issue 1, a charge of Medicaid fraud cannot be based on the violation of a policy which has not been adopted in compliance with MAPA. These reimbursement rates were not validly promulgated rules, but were instead left to informal policy. Thus, they lacked the force of law.

¶50 Accordingly, we hold that David's conviction on Count II should be reversed because it was based on the violation of an administrative policy which had not been adopted in compliance with MAPA.

## Issue 5.

¶51 *Whether the State introduced sufficient evidence to convict David on Count IV, unsworn falsification to authorities.*

¶52 We review the sufficiency of the evidence to support a jury verdict in a criminal case to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Stucker*, ¶ 15 (citing *State v. Lantis*, 1998 MT 172, ¶ 32, 289 Mont. 480, ¶ 32, 962 P.2d 1169, ¶ 32).

¶53 In 1997, DPHHS requested that all Montana Medicaid providers re-enroll with the Medicaid program by June 1997. David submitted his re-enrollment form on April 25, 1997. One of the questions on the form asked if the provider was the spouse or sibling of an agent or managing employee of the optometric business, or the spouse or sibling of someone with a 5% or greater ownership or control interest in the business. David responded "no" to this question. The form also asked the provider to name the "county" in which he provided Medicaid services. To this question, David responded "Powell County" indicating the county of his main office.

¶54 On the basis of his answers to these questions, the State charged David with violating § 45-7-203(1)(b), MCA, which provides:

> (1) A person commits an offense under this section if, with purpose to mislead a public servant in performing his official function, he:

. . .

    (b) purposely creates a false impression in a written application for any

    pecuniary or other benefit by omitting information necessary to prevent statements therein from being misleading; . . .

¶55 In its closing argument at trial, the State claimed to have proven that David should have listed his sister and his wife as managing employees; that David should have listed Leonard as a co-owner of the businesses; and that David should have listed all of the counties in which he owns optometric stores.

¶56 David asserts that the State failed to prove that he omitted information on the re-enrollment form with the conscious objective of misleading a public servant in the performance of his or her official duties. He maintains that there was insufficient evidence to convict him on this count and that he was prejudiced by his convictions on Counts I and II.

¶57 The State argues on the other hand, that David never presented his claim of prejudice to the District Court, thus it was waived and should not be considered by this Court. The State also argues that even if that claim is not waived, David did not suffer any prejudice because the jury found him guilty of Count IV based on the evidence presented at trial which established beyond a reasonable doubt that he was guilty of violating § 45-7-203, MCA.

¶58 The unsworn falsification statute requires proof that David omitted information on his Medicaid provider re-enrollment form with the conscious objective of misleading a public servant in the performance of his or her official duties. We disagree with the State's contention that there is a "wealth of evidence" supporting David's conviction of unsworn falsification to authorities.

¶59 First, the State argued that David's sister, Patricia Terry, was working as a managing employee in David's Bozeman store in April 1997, when he submitted the re-enrollment form to DPHHS. The State maintained that Patricia is a managing employee because Shane Shaw, an agent with the Department of Justice, testified that in an interview he conducted with David in September 1997, David said that Patricia was the manager of the Bozeman store. The State also notes that Patricia managed David's Bozeman store starting

in 1986 and although she started working at Montana State University in December 1996, Patricia continues to work for her brother in Bozeman.

¶60 However, the State fails to note Patricia's own testimony that while she continues to work on a limited basis in the Bozeman store, she is no longer the manager and has not been the manager of that store since May 1996. Patricia testified that she left her position with the Bozeman store in May 1996 because her husband was ill and she stayed at home to care for him. She further testified that she went to work full time for Montana State University in December 1996 and that she returned to work in the Bozeman store part time, but not as a manager.

¶61 The State also failed to note that Agent Shaw testified that in the September 1997 interview with David, he did not discuss with David a time frame for when Patricia managed the Bozeman store. Thus, the State presented no evidence supporting its claim that Patricia managed David's Bozeman store in April 1997, when David filled out and submitted the re-enrollment form.

¶62 Second, the State maintained that the testimony at trial established that Marie was a managing employee because she offered employment to individuals, discussed hiring with employees, and negotiated employment contracts. The State introduced evidence at trial that Marie hired optician Dennis Haines who manages David's Great Falls store. However, Haines testified that he does not take direction from Marie as David is his boss. Haines also testified that although it was Marie that called and offered him the position, he was actually interviewed by both David and Marie.

¶63 In addition, Roseanne Follman, David's bookkeeper, testified that although Marie sometimes helped out by interviewing prospective employees, she never managed any of David's stores and she had no authority to write checks or to fire people. Thus, the State never established that Marie's limited participation in the business ever rose to the level of a managing employee or that such participation occurred at or near the time David re-enrolled with Medicaid in April 1997.

¶64 Third, the State also claimed that testimony at trial established that Leonard had an ownership interest in the business at the time David re-enrolled with Medicaid because both Leonard's and David's names were on the checking account (along with bank stamps, deposit slips, and checks) used by the business. The State introduced documents filed with the Montana Secretary of State showing that the corporation of "Leonard E. and David G.

Vainio" owned American Eyecare, the name used by David to refer to his statewide business, during the time period at issue.

¶65 However, Leslee Shell-Beckert, with the Secretary of State's office, testified that merely because a name is in the title of a corporation does not mean that that person has an ownership interest in the corporation. In that regard, Shell-Beckert testified as follows:

> Q. . . . So the fact that incorporation papers were filed called Leonard E. and David G. Vainio, PC, tells us absolutely nothing about the relationship of Leonard Vainio to the corporation. Right?
>
> A. Yes.
>
> Q. Because it is just the name?
>
> A. Right.
>
> Q. Okay. And it doesn't tell us anything about the relationship Leonard Vainio has with David Vainio for that matter.
>
> A. Not the business name. Correct.

¶66 Furthermore, David's bookkeeper testified that although Leonard was treated differently than other employees because he was David's brother, Leonard had no ownership interest in the business as he could not write checks, he could not fire people, and he had no access to the accounts or other business records. In addition, several of David's employees and former employees testified that David was and had been their boss, not Leonard, and that they did not take orders from Leonard. They also testified that Leonard did not have the authority to fire them.

¶67 While the State stressed the fact that Leonard's name remained as part of the corporate name of the business, the State introduced no evidence showing that Leonard actually owned an interest in the business or that such interest was "5% or more" as the re-enrollment form specified. Moreover, the corporation's 1997 income tax statement reflected that David was the corporation's sole shareholder.

¶68 Lastly, the State claimed that David should have listed the counties of all of his stores

on the re-enrollment form, not just the county of his main office. However, the State presented no evidence that David purposefully intended to mislead a public servant by listing the main office from which he did business.

¶69 David had a longstanding relationship with the Medicaid program by the time he filled out the re-enrollment form. David argues that he merely answered the question as he had in the previous enrollment form, by listing the county of his corporate office. He also argues that as far as he was aware, DPHHS and Consultec knew that he owned stores in several counties. The State failed to prove that David purposely rendered his re-enrollment form misleading by omitting information. Nor did the State offer any evidence that David omitted information with the specific purpose of preventing any public servants from performing their official duties. In its closing argument, the State conceded that the unsworn falsification statute requires proof of two elements--an omission of information and an intent to mislead a public servant. However, after recounting the evidence of David's alleged omissions, the State never addressed the element of intent to mislead, nor did the State present any evidence of such intent.

¶70 Accordingly, we hold that there was insufficient evidence to convict David of Count IV, unsworn falsification to authorities.

## Conclusion

¶71 Because the administrative policies at issue in Counts I and II had not been adopted in compliance with MAPA, they were not validly promulgated rules and thus lacked the force of law. Consequently, we reverse David's conviction on Counts I and II for Medicaid fraud. We also reverse David's conviction on Count IV because the State failed to produce sufficient evidence to support the charge of unsworn falsification to authorities.

¶72 Reversed.

/S/ JAMES C. NELSON

We Concur:

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER

/S/ PATRICIA COTTER

/S/ W. WILLIAM LEAPHART

1. According to the *Montana Standard*, Leonard Vainio passed away on April 10, 2001.